IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| M.G., et al. | : |
|  | : |
| v. | : Civil Action No. DKC 22-494 |
|  | : |
| MONIFA B. MCKNIGHT, et al. | : |
|  | : |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this action arising under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, are a motion for summary judgment filed by Plaintiffs M.G., R.G., and D.Z. ("Plaintiffs"), (ECF No. 24), and a cross-motion for summary judgment filed by Defendants Montgomery County Board of Education and Monifa B. McKnight ("Defendants"), (ECF No. 25).  The issues have been briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, Plaintiffs' motion for summary judgment will be granted in part and denied in part, and Defendants' cross-motion for summary judgment will be granted in part and denied in part.

I.   **Background**

   A. **The Individuals with Disabilities Education Act**

   The IDEA, 20 U.S.C. §§ 1400 *et seq.*, and its accompanying regulations, 34 C.F.R. §§ 300 *et seq.*, require states that receive

federal education funds to make available to each child between the ages of three and twenty-one who has a disability a free appropriate public education ("FAPE").  20 U.S.C. § 1412(a)(1)(A).  Maryland also has regulations governing the provision of FAPEs to children with disabilities in accordance with the IDEA.  Md. Code Regs. 13A.05.01.

To ensure delivery of a FAPE, local education agencies[1] are required to prepare and implement an appropriate individualized education program ("IEP") for each child determined to have a disability.  20 U.S.C. § 1414(d).  An IEP is a "written statement for each child with a disability that is developed, reviewed, and revised" by the child's "IEP Team," which is composed of the child's parents, teachers, a representative of the local education agency, and others.   § 1414(d)(A)-(B).   The IEP must contain statements about the child's current educational performance, the annual goals for the child's education, the special educational services and other aids that will be provided to the child, and the extent to which the child will spend time in school environments with non-disabled children, among other things.  § 1414(d)(1)(A).  The IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch.*

---

[1] This opinion uses the term "local education agency" interchangeably with "school district."

*Dist. RE-1*, 580 U.S. 386, 399 (2017).  Additionally, the child must be educated in the "least restrictive environment," which means that the child must be "educated with children who are not disabled" "[t]o the maximum extent appropriate" and only removed from the "regular educational environment . . . when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  § 1412(a)(5).

The IDEA requires that states establish certain "Procedural Safeguards" that are "designed to ensure that the parents or guardian of a child with a disability are both notified of decisions affecting their child and given an opportunity to object to these decisions."  *Gadsby ex rel. Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir. 1997) (citing § 1415).  These include a process by which parents can file a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child."  § 1415(b)(6).  Once they have filed a complaint, parents are entitled to an "impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency."  § 1415(f)(1)(A).  In Maryland, due process hearings are conducted by an Administrative Law Judge ("ALJ") at the Maryland Office of Administrative Hearings.  *See* Md. Code Ann., Educ. § 8-413; Md. Code Regs. 13A.05.01.15(C).  If parents are

unsatisfied with the findings and decision made by the ALJ, they have a right to bring a civil action with respect to their due process complaint in state or federal court.  § 1415(i)(2)(A). Under those circumstances, the parents bear the burden of proof both in the administrative hearing and before the state or federal court.  *See Weast v. Schaffer ex rel. Schaffer*, 377 F.3d 449, 456 (4th Cir. 2004) ("[P]arents who challenge an IEP have the burden of proof in the administrative hearing[.]"); *Bd. of Educ. of Montgomery Cnty. v. Hunter ex rel. Hunter*, 84 F.Supp.2d 702, 705 (D.Md. 2000) ("[P]arties aggrieved by the administrative decision may file suit in federal district court, [and] [t]he burden of proof is on the party challenging the administrative decision.").

When a court determines by a preponderance of the evidence that a local education agency has failed to provide a FAPE to a child with a disability, the court is authorized to "grant such relief as the court determines is appropriate." § 1415(i)(2)(C)(iii).  Courts enjoy "broad discretion" in fashioning relief, and "equitable considerations are relevant" in doing so.  *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369, 374 (1985).  Reimbursement for private school tuition may be an appropriate form of relief when the child's parents have unilaterally chosen to place the child in a private school after a local education agency failed to make a FAPE available in a timely manner.  § 1412(a)(10)(C); *see also Burlington*, 471 U.S. at

369–70.  The court may order the state to reimburse the parents for the private school tuition if it determines that the state failed to provide a FAPE and that the private school placement was proper under the IDEA.  *See Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009) (clarifying that this remedy may be appropriate "regardless of whether the child previously received special education or related services through the public school").  However, "[t]otal reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable."  *Carter*, 510 U.S. at 16.

### B. Factual Background

Unless otherwise noted, the following facts are drawn from the ALJ's Findings of Fact.[2]  (Decision at 5-12).[3]  The relevant facts are not in dispute.  M.G. was enrolled in Montgomery County Public Schools ("MCPS") by his parents, D.Z. and R.G. (the

---

[2] There is no evidence that the ALJ's findings were not regularly made.  Thus, these findings are prima facie correct. *See Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991).

[3] The Administrative Record has not been filed electronically. The paper copy is filed under seal in the Clerk's Office. Citations to the record are labeled according to the following format: citations to the ALJ's Decision are labeled "Decision at [Page Number]"; citations to the hearing transcript are labeled "Tr. [Volume Number] at [Page Number]"; citations to Plaintiffs' exhibits are labeled "P. [Exhibit Number]"; and citations to Defendants' exhibits are labeled "D. [Exhibit Number]."

"Parents"), starting in kindergarten.  In M.G.'s fifth-grade year, he began to lose focus in class.  He underwent psychological testing just before his sixth-grade year, in August 2015.  Dr. James Sydnor-Greenberg, Psy.D. tested M.G. and issued a report on or about August 28, 2015 (the "Greenberg Report"), which described his conclusion that M.G. had Attention Deficit Hyperactivity Disorder (ADHD) and a Math Disability and that he would benefit from a 504 Plan.[4]  The Parents provided a copy of the Greenberg Report to MCPS at the beginning of M.G.'s sixth-grade year.

MCPS convened a meeting to develop a 504 Plan for M.G., based in part on the Greenberg Report.  A 504 Plan with the following accommodations was implemented starting in October 2015: graphic organizer; mathematics tools and calculations devices on tests; responses on test booklet; preferential seating in the front of class toward the perimeter; student plan book, monitored and signed daily; "stickies" to mark homework pages; copy of notes; extended

---

[4] A "504 Plan" is an individualized accommodation plan under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), that operates in some ways like an IEP under the IDEA, but the measure of whether the education a child receives complies with Section 504 differs from the IDEA standard: The test is whether the education meets a disabled child's needs "as adequately" as it meets the needs of a non-disabled child.  *See K.D. ex rel. J.D. v. Starr*, 55 F.Supp.3d 782, 784 (D.Md. 2014) (citing 34 C.F.R. §§ 104.33(b), (c)).  Unlike IEPs, which are required to contain things like performance goals and benchmarks for progress, 504 Plans are geared more toward providing reasonable accommodations to students with disabilities.  *See id.* at 785 n.3.

time on tests; resource class; movement breaks; and frequent evening attention.

M.G. received all A's and B's for sixth grade, including a B in math. MCPS issued an updated 504 Plan in February 2017, during M.G.'s seventh-grade year, which contained the same accommodations as the previous plan but removed the graphic organizer, mathematics tools and calculations devices on tests, and responses on test booklet accommodations. M.G. received A's, B's, and C's for seventh grade, including C's in his math and world studies classes.

MCPS issued an updated 504 Plan in February 2018, during M.G.'s eighth-grade year, which contained the same accommodations as the previous plan. MCPS issued another updated plan in April 2018, which removed the resource class from the list of accommodations. M.G. received all A's and B's for eighth grade, including a B in math. However, he began to exhibit disengagement and class avoidance.

M.G. transitioned to high school for ninth grade at Walt Whitman High School ("Whitman"). The April 2018 504 Plan remained in effect. At Whitman, M.G.'s disengagement and class avoidance increased, including through his use of his phone during class. He developed an interest and talent in acting, and he participated in a theater performance outside of school during ninth grade, which required him to miss some classes. MCPS convened a 504 Team meeting at Whitman in March 2019, where the team determined M.G.'s

continued eligibility for a 504 Plan due to his ADHD diagnosis. They issued an updated plan that contained the same accommodations as the previous plan with the added accommodation of a calculation device for math.  M.G. received a combination of A's, B's, C's, and D's for ninth grade, including D's in math and history.  M.G. also began to exhibit behavioral issues at home.

The Parents removed M.G. from MCPS for his tenth-grade year and enrolled him in the Metropolitan School of the Arts ("MSA"), a school located in the Washington D.C. metropolitan area with an arts focus and smaller class sizes.  M.G.'s disengagement, class avoidance, and behavioral issues at home continued while he attended MSA.   He also began to engage in unhealthy peer relationships, including in his dating relationships with female peers.[5]  He left MSA on a "leave of absence" during his tenth-grade year.  The Parents enrolled M.G. in True North Wilderness Camp ("True North") in Vermont for the summer of 2020.  At True North, M.G. saw a therapist and took classes, but he did not receive special education services.   He also received psychological testing.  The testing was conducted remotely, due to the COVID-19 pandemic, by Dr. Justine O'Donnell, Psy.D.  She issued a report in August 2020 (the "O'Donnell Report") that described

---

[5] The ALJ described that M.G. "began to exhibit detrimental and obsessive relations with female peers," including "dating more than one female peer at once."  (Decision at 8).

her conclusion that M.G. had ADHD, Bipolar II Disorder, Attachment, Generalized Anxiety Disorder, and a Math Disorder.   Both Dr. O'Donnell and True North recommended that the Parents enroll M.G. in a residential therapeutic boarding school.

The Parents enrolled M.G. in the Grove School, a residential therapeutic boarding school in Connecticut, on September 14, 2020, and he has attended that school ever since.   The Grove School provides M.G. with adult supervision twenty-four hours per day, seven days per week.  He has a dedicated treatment team consisting of an advisor, an academic case manager, a therapist, a psychiatrist, and the Parents.   Students at the Grove School participate in two individualized therapy sessions and one group therapy session per week.  A psychiatrist oversees the students' medication management.  Students may also participate in evening and weekend study hall.  The Grove School does not provide M.G. with access to any non-disabled peers.

On September 17, 2020, the Parents formally requested that MCPS evaluate M.G. for special education services.   The ALJ reported that the parents wanted their son "to eventually return to Maryland."  (Decision at 17).  Maryland regulations require that local education agencies conduct an initial evaluation of a student within ninety days of receiving a request by a child's parent that the child be evaluated for eligibility for special education services.  Md. Code Regs. 13A.05.01.06(A)(1)(b).  MCPS

timely evaluated M.G. on December 17, 2020.[6]  The evaluation team considered, among other things, the O'Donnell Report and determined that M.G. was eligible for special education services as a child with an emotional disability.

Maryland regulations require local education agencies to convene an IEP Team meeting to develop an IEP for a student who has been determined to have a qualifying disability within thirty days of the evaluation, which in this case would have been January 16, 2021.  Md. Code Regs. 13A.05.01.08(A)(1).  MCPS scheduled an IEP meeting on January 13, 2021.  However, MCPS cancelled the meeting and proposed to reschedule on January 15, 2021.  The Parents did not agree to the January 15, 2021, date.  The Parents' counsel emailed MCPS to schedule the meeting on a different date. MCPS ignored at least two of the Parents' counsel's emails, and an IEP meeting did not occur until April 5, 2021.  M.G. was enrolled at the Grove School throughout that time.

At the April 5 meeting, the IEP Team adopted the findings of the O'Donnell Report.  The Parents attended the meeting and were accompanied by two staff members from the Grove School who were familiar with M.G.  The IEP Team concluded that the Social

---

[6] The Parents argued before the ALJ that MCPS failed to evaluate M.G. in a timely manner because ninety days from September 17 would be December 16.  However, the ALJ found that, because the Parents submitted their request via email after normal business hours on September 17, the deadline was December 17.  The Parents do not challenge that determination before this court.

Emotional Special Education Services Program (the "SESES Program") at Whitman was the least restrictive environment to provide M.G. with a FAPE, and they issued an IEP reflecting that placement (the "April 2021 IEP").  The SESES Program supports students whose social-emotional disabilities impede their ability to access their education.  Students in the SESES Program attend individualized resource classes and have a case manager.  They receive individualized supports, and a clinical social worker monitors their needs, coordinates with outside service providers, and provides feedback on the use of emotional supports.  A psychologist provides counseling services based on students' needs.  Students in the SESES program can take classes with non-disabled peers.

The Parents did not object generally to the goals and accommodations in the proposed IEP but believed their son required additional supports.  They rejected the SESES program on April 16, 2021, and they requested that M.G. remain at the Grove School at public expense.  MCPS refused.  The Parents filed a due process complaint with the Maryland Office of Administrative Hearings.  A hearing was held before Administrative Law Judge Nicolas Orechwa on October 5, October 6, October 7, October 19, October 20, and October 21, 2021. At the hearing, the ALJ considered the following issues: (1) Whether MCPS failed in its Child Find obligations  to identify M.G. as disabled in a timely manner; (2) Whether MCPS failed to evaluate M.G. for a disability in a timely manner and,

upon determining M.G. to be disabled, failed to convene an IEP meeting in a timely manner; and (3) Whether the April 2021 IEP proposing placement in the SESES program was reasonably calculated to provide M.G. with FAPE in light of his unique circumstances, and whether placement was proper at the Grove School and True North.  The Parents presented testimony from M.G.'s mother, staff members from True North and the Grove School, and Dr. O'Donnell, and MCPS presented testimony from staff members at Whitman, including those involved with the SESES program.

The ALJ issued a decision (the "ALJ Decision") on November 2, 2021, denying the Parents all requested relief.  Specifically, the ALJ concluded that (1) MCPS met its Child Find obligations; (2) MCPS timely evaluated M.G. but did not timely convene an IEP meeting after the evaluation was completed; (3) the failure to convene an IEP meeting in a timely manner was only a procedural violation and not a substantive violation because M.G. still received services at the Grove School consistent with the April 2021 IEP; and (4) the April 2021 IEP was reasonably calculated to provide M.G. a FAPE and placed him in the least restrictive environment consistent with his educational needs.

Plaintiffs filed a complaint in this court on March 1, 2022, requesting that the ALJ's decision be vacated, that the Grove School be declared M.G.'s educational placement, and that MCPS be ordered to reimburse them for the costs of enrolling M.G. there.

(ECF No. 1).  Plaintiffs filed a motion for summary judgment on May 13, 2022, in which they argue they are entitled to summary judgment because (1) the ALJ erred in concluding that MCPS's delay in developing M.G.'s IEP was not a substantive violation of the IDEA, and (2) the April 2021 IEP was inappropriate because M.G. required a residential placement.[7]  (ECF No. 24-1).  Defendants filed a response and cross-motion for summary judgment on June 24, 2022, in which they argue that the ALJ Decision was correct and, therefore, they are entitled to summary judgment.  (ECF No. 25-1).  The parties each filed replies.  (ECF Nos. 26, 27).

## II.  **Standard of Review**

In IDEA cases, reviewing courts make "a bounded, independent decision"—that is, "bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court."  *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991) (quoting *Burke Cnty. Bd. Of Educ. v. Denton ex rel. Denton*, 895 F.2d 973, 981 (4th Cir. 1990)).  The United States Court of Appeals for the Fourth Circuit articulated the standard of review for motions for summary judgment in IDEA cases in *M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530-31 (4th Cir. 2002):

---

[7] Plaintiffs raised additional issues in their complaint, but these are the only two issues the parties discuss in their motion and cross motion.

> In a judicial proceeding under the IDEA, a
> reviewing court is obliged to conduct a
> modified de novo review, giving "due weight"
> to the underlying administrative proceedings.
> *[Bd.] of Educ. v. Rowley*, 458 U.S. 176 . . .
> (1982); *Doyle v. Arlington [Cnty.] Sch. Bd.*,
> 953 F.2d 100, 103 (4th Cir. 1991) ("Generally,
> in reviewing state administrative decisions in
> IDEA cases, courts are required to make an
> independent decision based on a preponderance
> of the evidence, while giving due weight to
> state administrative proceedings."). In such
> a situation, findings of fact made in
> administrative proceedings are considered to
> be prima facie correct, and if a reviewing
> court fails to adhere to them, it is obliged
> to explain why. *Doyle*, 953 F.2d at 105. The
> court is not, however, to "substitute [its]
> own notions of sound educational policy for
> those of local school authorities." *Hartmann
> v. Loudoun [Cnty.] Bd. of Educ.*, 118 F.3d 996,
> 999 (4th Cir. 1997).

After giving due weight to the administrative findings of fact, the reviewing court may conclude "that the evidence considered as a whole pointed to a different legal conclusion than that reached by the" ALJ. *Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 485 (4th Cir. 2011). Additionally, pure questions of law are reviewed de novo. *See E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 514 (4th Cir. 2014); *see also R.S. v. Smith*, No. 20-cv-1300-PX, 2021 WL 3633961, at *7 (Aug. 17, 2021).

The general standards of review for summary judgment motions also apply: The moving party must show "that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56(a).  In determining whether a moving party has made that showing, a court must consider the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Where, as here, cross-motions for summary judgment have been filed, a court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Bollech v. Charles Cnty.*, 69 F.App'x 178, 180 (4th Cir. 2003) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

## III. Analysis

This analysis proceeds first with the issue of whether the April 2021 IEP was reasonably calculated to provide M.G. a FAPE—that is, whether the SESES Program, rather than the Grove School, is the appropriate least restrictive environment for M.G.[8]  A conclusion regarding that issue will facilitate the discussion of the other issue: whether MCPS's delay in providing M.G. with an IEP constituted a violation for which Plaintiffs are entitled to relief, and if so, to what relief they are entitled.

---

[8] Plaintiffs have not taken issue with any aspect of the April 2021 IEP other than the "placement."  They did not object to the goals and accommodations but contend that they do not go far enough regarding support outside of school hours.

### A. Appropriate Placement

Plaintiffs argue that the ALJ erred in finding that the SESES program was the appropriate placement for M.G. because he requires a residential placement in order to access a FAPE. (ECF No. 24-1 at 20). They emphasize that all the Parents' witnesses recommended that he be educated in a residential setting, including Dr. O'Donnell, who testified that he would struggle in a therapeutic day school because "he could just come home [from school, and] he wasn't going to be able to manage himself very well" during after-school hours and "when he had free time." (Tr. 3 at 461). She added that "without the containment of a 24/7 setting, he was just going to go back to behaviors that [would] keep him off track," she "didn't feel like he was ready . . . to utilize outpatient therapy," and she "just felt like he was going to continue getting into the cycles that he was getting into with dating relationships." (Tr. 3 at 465-66). Another Parents witness highlighted the benefit of "having the same people who teach [M.G.] during the day stay with [him] and live with [him] and do activities with [him]. . . and be able to follow through on [things he learned during certain parts of the day] at other parts of the day," specifically regarding his challenges in peer relationships. (Tr. 1 at 250).

Defendants respond that Plaintiffs have failed to explain sufficiently why the SESES program could not meet M.G.'s needs and

have not met the high standard for proving that M.G. requires "one of the most restrictive placements on the placement continuum." (ECF No. 25-1 at 33).  They add that while Plaintiffs' witnesses explained the potential benefits of a residential setting in addressing M.G.'s emotional needs, they have not demonstrated that M.G.'s emotional needs could not be separated from his ability to learn.

The IDEA requires local education agencies to fund residential placements if "the educational benefits which can be provided through residential care are essential for the child to make *any* educational progress at all." *Shaw v. Weast*, 364 F.App'x 47, 53 (4th Cir. 2010) (quoting *Burke Cnty. Bd. of Educ. v. Denton*, 895 F.2d 973, 980 (4th Cir. 1990), a case brought under the Education of the Handicapped Act, the predecessor of the IDEA). However, residential care is not required "merely to enhance *an otherwise sufficient* day program."  *Id.* (quoting *Denton*, 895 F.2d at 980).  Thus, "medical, social, or emotional problems that are segregable from the learning process" cannot by themselves justify residential placement.  *Id.* (quoting *Denton*, 895 F.2d at 980).

In *Shaw*, the court determined that a student who was diagnosed with emotional disturbance, hearing impairment, speech and language impairment, learning disabilities, bipolar disorder, clinical depression, posttraumatic stress disorder, and suicidal tendencies could access a FAPE in a private special education day

school, rather than a residential treatment facility, because she possessed "basic self-help and social skills . . . and sufficient abilities to proceed in her studies in the less restrictive environment of a private day school." *Id.* at 49, 54. The court distinguished her case from the circumstances in *Kruelle v. New Castle Cnty. Sch. Dist.*, 642 F.2d 687 (3d Cir. 1981), where a child "who was unable to speak and not toilet trained was found to need extensive around the clock care as part of his FAPE," such that a residential placement was appropriate. *Shaw*, 364 F.App'x at 53. The *Shaw* court concluded that the facts presented were "near the other end of the spectrum" and that treatment of the student's "mental health and safety issues was distinct and segregable from her educational needs." *Id.* at 53-54.

The present case is much closer to *Shaw* than *Kruelle*. Although children with needs less severe than those of the child in *Kruelle* may still require a residential placement, the question is whether a child's "medical, social, or emotional problems are intertwined with educational problems." *Denton*, 895 at 980 (citing *Kruelle*, 642 F.2d at 693-94). Plaintiffs acknowledge that this standard applies, (ECF No. 26 at 9-10), yet they do not explain how M.G.'s social-emotional needs are "intertwined" with his ability to access an education. Instead, the evidence Plaintiffs identify at most supports a conclusion that a non-residential placement would leave M.G. with insufficient supports *after* school

to address his social-emotional needs *during those times*. Plaintiffs' witnesses focused on the benefits a residential program would have for addressing M.G.'s behavioral difficulties at home and in peer and dating relationships, but the witnesses have not established that those difficulties are not "segregable from the learning process." *See Denton*, 895 F.2d at 980.  While it may be *desirable* for M.G. to have access to supports after school to complement his in-school social-emotional education, Plaintiffs have not provided evidence that M.G. *requires* those after-school supports to access a FAPE in school.  Thus, the ALJ correctly found that a residential placement was not necessary for M.G. to make appropriate educational progress.

Plaintiffs argue in their reply that the ALJ improperly deferred to the MCPS witnesses on M.G.'s appropriate placement who, unlike their own witnesses, did not have first-hand knowledge of M.G.  (ECF No. 26 at 5).  However, the ALJ's determinations were not based on the credibility of the witnesses but rather on his finding that the Parents' witnesses' testimony did not support a conclusion that a residential placement, rather than a day program like the SESES program, was required to provide M.G. a FAPE.  In discussing the testimony of one of the Parents' witnesses—the principal of the Grove School—the ALJ explained that the principal's testimony

underscores a fundamental problem with the
Parents' case. He clearly believes the Grove
School is an "appropriate" placement for
[M.G.] However, he fails to address the more
important question: why? In particular, why
does the Grove School provide [M.G.] FAPE but
the SESES program does not? The Parent[s']
case contains much testimony about what they
consider to be the merits of the Grove School,
but nothing in terms of why the SESES program
does not provide FAPE. While I understand[]
the Parents' position that [M.G.] requires a
full time residential placement, they provided
no evidence as to why the SESES program would
fail to serve as an appropriate placement and
provide FAPE. They offered no tangible
evidence to conclude the SESES program more
likely than not fails to provide FAPE. I heard
no testimony from [M.G.'s] teachers at the
Grove School on the issue. Dr. O'Donnell
provided no opinion as to the alleged
shortcomings of the SESES program.

(Decision at 46-47).

As the ALJ found, the record is devoid of evidence that the

supports M.G. would receive through the SESES program were not

"reasonably calculated to enable [M.G.] to make progress

appropriate in light of [his] circumstances." *Endrew F.*, 580 U.S.

at 399. Indeed, other than arguing that M.G. "requires" the

residential programming he receives at the Grove School,

Plaintiffs' motion and reply are devoid of *arguments* as to why the

SESES program would not have provided M.G. a FAPE. Plaintiffs

argue in their reply that the services M.G. would have received in

the SESES program are very different from those he receives at the

Grove School. (ECF No. 26 at 10). Clearly, there are significant

differences between the two placements.  If M.G. were placed at Whitman in the SESES program, he would likely have been educated in a general education setting (with supports) for part of the week, he might have been in larger classes, and he would have received no support outside of the school day.  The record reflects that he would have received two forty-five-minute counseling sessions per week and one sixty-minute social worker session per month, whereas the Grove School provides two individualized therapy sessions and one group therapy session per week.  (D. 94; Decision at 10).  However, M.G.'s IEP Team concluded that the SESES program would have allowed M.G. to access a FAPE, and Plaintiffs have not sustained their burden to prove that the aspects of the SESES program that are less intensive than the Grove School program would result in a denial of FAPE.

Additionally, as the ALJ properly noted, the SESES program is a much less restrictive environment than a full-time residential placement at the Grove School.  The IDEA requires that children with disabilities be educated with their non-disabled peers "[t]o the maximum extent appropriate." 20 U.S.C. § 1412(a)(5).  Because Plaintiffs have not proven by a preponderance of the evidence that M.G. cannot access a FAPE in the SESES program, in which he would have access to non-disabled peers at least some of the time, the SESES program is his appropriate least restrictive environment.

Accordingly, M.G.'s placement in the SESES program was consistent with the requirements of the IDEA.

### B. Denial of FAPE

According to Plaintiffs, the "focus" of their appeal "relates to the school system's delay in developing an IEP for M.G. and the ALJ's failure to find an adverse impact on his education and award them reimbursement for his placement at" the Grove School.  (ECF No. 24-1 at 9).  The ALJ found that MCPS committed a procedural violation in delaying the development of M.G.'s IEP until April 2021.  (Decision at 36-37).  Neither party contends that this determination was in error.  However, Plaintiffs take issue with the ALJ's determination that this delay was not a "substantive violation" of the IDEA that would entitle them to relief. Specifically, the ALJ found that because "the Grove School . . . provided most, if not all, the same or similar accommodations set forth in the" April 2021 IEP, there was no "adverse effect" on M.G.'s education.  (Decision at 37).

The IDEA provides that a hearing officer's decision may rest on a procedural violation only if it "[1] impeded the child's right to a [FAPE]; [2] significantly impeded the parents' opportunity to participate in the decisionmaking process . . . ; or [3] caused a deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii).  The ALJ erred in determining that the delay in developing M.G.'s IEP did not deny him a FAPE.  While it may be

22

true that M.G. was provided with services that allowed him to access an appropriate education while at the Grove School during the delay, the ALJ failed to recognize the deprivation of the "F" in FAPE: The education M.G. received was not "free."

Defendants argue that the delay did not cause any denial of FAPE because M.G. was enrolled in the Grove School before the delay occurred, and the Parents' rejection of the April 2021 IEP demonstrates that they would have kept him enrolled there no matter when the IEP meeting took place.   (ECF No. 25-1 at 23-25). Defendants' counterfactual presumes too much.   There is no reason other than speculation to conclude that, had an appropriate IEP been in place in January 2021 (presumably around the start of the second half of the school year at Whitman), the Parents would not have been willing to move M.G. back to Whitman.   Indeed, the ALJ acknowledged that the parents said that, at the time they requested evaluation in September 2020, they wanted M.G. to return to Maryland "eventually."   Their willingness to accept the IEP and change M.G.'s enrollment may very well have decreased significantly by April, when only a few months remained in Whitman's school year.

Defendants rely on *T.B. ex rel. T.B. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 573 (4th Cir. 2018), for the proposition that a school district's failure to develop an IEP in a timely manner is not a denial of FAPE if the child would not have utilized

the IEP anyway.  That case involved a student who had refused to attend school at all, which is clearly different from the present case.  Defendants also cite *M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523 (4th Cir. 2002), and *M.K. v. Starr*, 185 F.Supp.3d 679 (D.Md. 2016), which have facts more analogous to this case but are still distinguishable.  In *M.M.*, the court determined that a school district's failure to finalize a proposed IEP was not a denial of FAPE because the parents had indicated they would not have accepted the IEP had it been finalized, based on their lack of cooperation with the process after the initial IEP had been proposed.  *M.M.*, 303 F.3d at 534-35.  In *M.K.*, the court determined there was no denial of FAPE from a school district's failure to notify parents of a student's acceptance at a private school that the district had proposed the student attend because the parents indicated they would not have accepted that placement anyway, based on their lack of cooperation in the application process and pursuit of another placement.  *M.K.*, 185 F.Supp.3d at 697.  Different is the case where a court is asked to infer based on parents' rejection of an IEP at one point in time that they would have rejected it months earlier just the same.  Unlike in *M.M.* and *M.K.*, M.G.'s parents participated fully in the IEP process throughout, and there is no evidence of their intent in January 2021 to reject any placements that were not the Grove School, beyond Defendants' mere speculation.

Ultimately, the record clearly reflects that if M.G.'s parents had not enrolled him in a private school that offered the requisite special education services, he would have been without an appropriate education until April 2021. He received one only due to the actions and funding of his parents, which means he was denied a FAPE. And starting January 17, that FAPE denial was due to Defendants' procedural violation. Thus, M.G. was denied a FAPE between January 17, the date after the deadline to develop the IEP had passed, and April 5, the date the IEP was finally developed.

However, the analysis does not end there. Having determined that a child was denied a FAPE, a court must determine what relief is "appropriate." § 1415(i)(2)(C)(iii). As previously noted, courts enjoy "broad discretion" in fashioning relief, and "equitable considerations are relevant" in doing so. *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369, 374 (1985). Plaintiffs seek reimbursement for the Grove School tuition. Generally, parents are "entitled to reimbursement [for private school tuition] *only* if a federal court concludes both that the public placement violated [the] IDEA and that the private school placement was proper under the Act." *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993). As Plaintiffs note, the standard for whether a parent's chosen private school is "proper" is lower than the standard for whether a local education agency's proposed placement is "appropriate": All that is required

is that the private school "is reasonably calculated to enable the child to receive educational benefits." *See Carter ex rel. Carter v. Florence Cnty. Sch. Dist. Four*, 950 F.2d 156, 163 (4th Cir. 1991), *aff'd*, 510 U.S. 7 (1993); *see also M.M. ex rel. J.M. v. Foose*, 165 F.Supp.3d 365, 370 (D.Md. 2015). Here, the ALJ determined that the Grove School "provided most, if not all, the same or similar accommodations set forth in the" April 2021 IEP. (Decision at 37). The record otherwise supports a conclusion that the services M.G. receives at the Grove School are reasonably calculated to enable M.G. to receive educational benefits, including the recommendations of Dr. O'Donnell and others. Therefore, the parents are entitled to reimbursement.

The question remains as to *how much* the parents are entitled to be reimbursed. Plaintiffs appear to be seeking full reimbursement for all tuition they have paid for M.G. to attend the Grove School. Defendants have stated that if Plaintiffs are entitled to reimbursement, they should only be reimbursed for "the time period between when M.G. was found eligible and his appropriate IEP was developed." (ECF No. 27 at 3 n.1).

Several equitable considerations are at play here. On one hand, because the April 2021 IEP was determined to have been reasonably calculated to provide M.G. a FAPE and the Parents rejected that IEP, reimbursement may not be appropriate for the time M.G. was enrolled at the Grove School after April 2021. *See*

20 U.S.C. § 1412(a)(10)(C)(i) ("[T]his subchapter does not require a local educational agency to pay for the cost of education . . . of a child with a disability at a private school or facility if that agency made a [FAPE] available to the child and the parents elected to place the child in such private school or facility."). Additionally, the Grove School provides services that are more intensive than those M.G.'s IEP Team has determined he needs to access a FAPE—specifically, the residential nature of the school has been determined to be unnecessary.  As previously noted, "[t]otal reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable." *Carter*, 510 U.S. at 16.

On the other hand, it would likely not have been feasible for M.G. to move to Whitman in April 2021, presumably only two months before the end of the school year.  This court dealt with a similar set of facts in *Kitchelt ex rel. Kitchelt v. Weast*, 341 F.Supp.2d 553 (D.Md. 2004).  In that case, due to a school district's delay, a meeting to finalize a child's IEP was not scheduled until about three weeks into the school year.  *Id.* at 556.  In the meantime, the parents enrolled the child in a private school.  The ALJ awarded the parents reimbursement for one month of the private school tuition, but Judge Messitte determined that to be inadequate because it would have been "insensitive at best" to have withdrawn the child after three weeks in the private school and enrolled him

in the public school.  *Id.* at 557.  Recognizing that it would have been unreasonable to require the school district to reimburse the parents for the entire school year, the court ordered that it reimburse them for one semester as a reasonable compromise.  *Id.* at 558.

A similar remedy is appropriate here.  Having received the Parents' request that M.G. be evaluated for special education services in September 2020, and having determined M.G. eligible for special education services on December 17, 2020,[9] there is nothing in the record to suggest that MCPS could not have had an IEP in place at or close to the start of the second half of the school year at Whitman, such that M.G.'s transfer there could have been more feasible.  Their failure to do so until April 2021 resulted in the Parents' being deprived of a realistic opportunity to choose to accept the IEP and move M.G. back to MCPS at that time.

As in *Kitchelt*, it would have been "insensitive at best" to move M.G. to MCPS in April 2021, near the end of the school year. Thus, reimbursement from mid-January 2021[10] through the end of the

---

[9] There is no indication as to why MCPS needed the full 90 days to determine M.G.'s eligibility.  It appears from the record that MCPS did not conduct its own evaluations and instead relied primarily on the O'Donnell Report, which was provided in September 2020.  (*See* P. 81, 92; T. 1 at 107-08).

[10] Defendants state that reimbursement may be appropriate starting from the time of M.G.'s evaluation.  (ECF No. 27 at 3

Whitman School year in mid-June 2021—five months of tuition at the Grove School—is appropriate.  However, because the Grove School is a residential placement, which is more than is necessary for M.G. to access a FAPE, MCPS will only be required to reimburse for the educational and therapeutic portions of the Grove School tuition and not the residential portion.  The record reflects that the Grove School tuition is broken into three components each month from January 2021 to June 2021: $5,000 for "education," $3,900 for "clinical," and $3,100 for "residential."  (P. 64).  Therefore, MCPS will be required to reimburse Plaintiffs $8,900 ("education" plus "clinical") for five months, or $44,500 in total.

## IV.  Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment will be granted insofar as they will be awarded reimbursement for the "education" and "clinical" portions of M.G.'s tuition at the Grove School for five months, at the rates that applied between January 2021 and June 2021, and the motion will be otherwise denied.  Defendants' cross-motion for summary judgment will be denied as to their liability for having denied M.G. a FAPE between January 17, 2021, and April 5, 2021, and it

---

n.1).  But Defendants' procedural violation was not until the deadline to develop M.G.'s IEP had passed: January 17, 2021. Therefore, reimbursement is more appropriate starting on that date.

will be otherwise granted.  Any petition for attorney's fees should
be filed in accord with local rules.

_____/s/_____

DEBORAH K. CHASANOW
United States District Judge
